PEOPLE v. BOVA.

(Supreme Court, Appellate Division, Second Department. November 5, 1915.)

HOMICIDE ☞254—MURDER—SECOND DEGREE—EVIDENCE.

   In a prosecution for murder, evidence *held* to sustain a verdict of murder in the second degree.

   [Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 533–538; Dec. Dig. ☞254.]

   Jenks, P. J., and Carr, J., dissenting.

Appeal from Trial Term, Westchester County.

Raffaele Bova was convicted of murder in the second degree, and he appeals. Affirmed.

Argued before JENKS, P. J., and THOMAS, CARR, RICH, and PUTNAM, JJ.

John J. Hughes, of White Plains, for appellant.
Frederick E. Weeks, Dist. Atty., of White Plains, for the People.

RICH, J.   In the early part of February, 1912, Philipo Carido entered the hallway of the house, No. 74 Bronx street, in White Plains, and, while on the stairs leading to the second story, was shot and instantly killed.   No eyewitness of the killing was called upon the trial, and the evidence against the defendant is largely circumstantial.   A stiletto was found upon the body of Carido, and on the stairs the police found a revolver fully loaded with ball cartridges.   The appellant and several others were indicted, charged with the murder, and upon the trial the appellant was convicted of murder in the second degree.   A motion to set the verdict aside and for a new trial was denied, and from the judgment of conviction this appeal is taken.

It seems that a woman named Conchetta was or had been living with one or more persons on the second floor of the building in which Carido was killed.   Entrance to the floor occupied by her was had from an outside porch into a hallway, and thence up a 3-foot stairway extending along the south wall of the building and terminating in a room used by her as a kitchen.   Around the well of the stairway there was a railing 6 feet 7 inches long, and 32 inches high, from the floor, which was made of four narrow boards nailed to posts.   There was a window in the kitchen directly over the front door, and nearly opposite this inclosed stair well, which faced to the west.   The left side of a person would be exposed to the kitchen in going up the stairs, and in going down the right side would be exposed.

Carido was killed with a shotgun.   The charge passed through his neck from right to left, taking a downward course and coming out on the left side, $1\frac{1}{2}$ inches lower and a little further back than the point of entrance on the right side.   The wound inflicted was $1\frac{1}{4}$ inches in diameter.   The vertebral column was fractured and the spinal cord entirely severed.   The autopsy disclosed several small punctured wounds near the roots of the hair, and a small hole in the lobe of the right ear, evidently made by scattering buckshot with which the gun was loaded.   From the main wound a shotgun wad and a buckshot were taken.   There was a discolored mark around the right leg, and the operating surgeon was of the opinion that it was made after death by a strap drawn tightly around it; the inference being that the strap was used to assist in dragging or carrying the body from the house to the sewer, where it was found.

On the underside of the second lower board forming the stairway guard or rail, a little more than a foot above the floor, was a circular hole cut by one or more of the buckshot undoubtedly fired from the gun that killed Carido.   There was a corresponding hole in the wall on the other side of the stairway, in the neighborhood of 8 to 10 inches lower and nearly 2 feet nearer the head of the stairs.   In this hole three lead slugs, a little larger than buckshot, were found imbedded.   A line drawn from the hole in the stair railing to the hole in the wall was on an angle, and crossed the fourth, fifth, and sixth steps of the stairway, from the bottom.   The distance from the fourth step to the hole in the second board of the stairway inclosure is 6 feet 5 inches, and from the sixth step to the hole in the wall 3 feet 8 inches.   The floor level of the second story is 5 feet above the fifth step.

These facts indicate that Carido was on the fifth stair from the bot-

tom when he was shot, and going down the stairs, or, if going up, had turned his head completely around and was looking back down the stairway, so that the right side of his head was toward the person who shot him, and that the latter stood at the west or front end of the stairway guard, with his gun pointing downwards to the rear of the building and diagonally across the stairway.

It is the theory of the prosecution that Carido had been lured into the building upon the pretext that the woman Conchetta wanted him, and that the time for the visit was fixed at an hour when he might suppose that the persons with whom she was living would be absent; that the appellant and his associates assembled at the house for the purpose of killing him, and were in the kitchen at the foot of the stairway inclosure at the time he entered the hall; that Carido started to go up the stairs, became alarmed at something, and turned to leave the building, when the appellant fired the shot; that Carido was unarmed when he entered the building, and that the revolver found upon the stairs and the stiletto found in the inside pocket of the vest upon his body were placed there after the killing.

The people presented testimony showing that, a few days before the death of Carido, one Demetrio Sara accompanied the Conchetta woman from White Plains to the city of New York. Upon reaching New York, they went to a house in Forty-Eighth street, where Carido was then living, where she remained; Sara returning to White Plains. The night following his return, the appellant called upon him at his house, and the two went to the house at 74 Bronx street, where Carido was subsequently killed. There they met Repeppi, Beppo, Romeo, and Tony Lotelli, and the appellant demanded that Sara disclose the whereabouts of Conchetta, and said to him that he would never leave the house unless he gave the information demanded. Sara finally informed them that the woman was in New York with Carido, and appellant thereupon took them to New York. Sara was taken to the basement of a building in which a number of his countrymen were assembled, none of whom, with the exception of the appellant and Repeppi, were known to him. He there met Buetti, Bombari, and Filistro, who are jointly indicted with the appellant. Sara was required to disclose the whereabouts of Conchetta to these men. He was detained that night, but was permitted to return to his home the next morning.

A few days later, Conchetta returned to White Plains and resumed her relations with Repeppi at No. 74 Bronx street. This was about a week before the death of Carido. On the day of her return, the appellant, Conchetta, and some or all of the other persons indicted with him were seen together, in consultation, in a vacant lot, after which Conchetta went to the house No. 74 Bronx street. Three or four days thereafter, Carido came to White Plains, where he met Sedri, and, after spending some time in the vicinity of the place where Conchetta was staying, Sedri accompanied him to Bronx street. On arriving in front of No. 70, Carido told Sedri to stop awhile, and he went into No. 74. It was then in the neighborhood of ten o'clock in the evening. Immediately following Carido's entrance into the hallway of the building, Sedri heard a shot, and, shortly after, the appellant came to the window

over the hall entrance, leaned out, and looked up and down the street. The appellant, Buetta, Romeo, Nortra, Repeppi, and the woman Conchetta then came out of the building, through the front door, and went down the street. They were seen and recognized by Sedri, who testifies that they were the same persons he saw in the vacant lot with Conchetta on the day she returned to White Plains. Neither Repeppi nor Conchetta have been seen at White Plains since that night. It seems that in the early part of November following one Mara was induced by one Stratti to accompany him to a piece of woods near the village, where he was met by the appellant and several other men, who took his money from him, and appellant said:

"If you say anything about this, we will kill you, and put you in the same place where we put Philipo Carido."

After the appellant was arrested and confined in the jail, an Italian detective was placed in the cell next to him, and permitted to be in his company each day while taking exercise. This detective testified that the appellant told him that Conchetta had run away with Carido; that she returned, and Carido came to get her again, and he (appellant) and Conchetta's husband killed him; that he shot Carido, and, with the others, threw his body in the water pipe. This testimony is denied by the appellant and his associates.

All of the witnesses who testified to the material issues involved were persons of a low grade of intelligence. The nature of their testimony and the manner in which it was given was such as to throw doubt upon its truthfulness, and this criticism is applicable to each of them. The appellant contends that there is no proof that Carido met his death through any criminal agency, and bases the contention upon the assumption that Carido entered the house of Repeppi armed, intending to get possession of Conchetta, if he had to kill some one in doing so, and was killed by Repeppi in repelling the invasion of his home. The evidence does not sustain this contention. While it is not as clear and convincing as we would like to have it to sustain a conviction depriving a person of his liberty for the period of his natural life, nevertheless we are convinced that the deceased was induced to visit this place, so that the appellant might avail himself of the opportunity to kill him. The learned justice who presided at the trial, with years of experience, and with his earnest desire to extend to the appellant every consideration, which is disclosed by his charge to the jury, declared on the motion to set aside the verdict that it was warranted by the evidence and should be sustained by the court.

The verdict of the jury is sustained by the evidence, and the judgment of conviction, and the order, must be affirmed.

THOMAS and PUTNAM, JJ., concur. JENKS, P. J., and CARR, J., dissent, upon the ground that the guilt of the defendant was not proven beyond a reasonable doubt.